UNITED STATES of America,
Plaintiff,

v.

Gary D. RAY, Defendant.

No. 00–40105–01–SAC.

United States District Court,
D. Kansas.

March 26, 2002.

James A. Brown, Office of United States Attorney, Topeka, KS, for Plaintiff.

Ronald E. Wurtz, Office of Federal Public Defender, Topeka, KS, for Defendant.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This case comes before the court on the defendant's following two pretrial motions to suppress: Motion to Suppress Evidence Involving Counts Two and Three (Dk. 27) and Motion to Suppress Evidence Involving Counts One, Four and Five (Dk. 29). The government filed a consolidated response opposing both responses. (Dk. 38).

On January 23, 2002, the court conducted an evidentiary hearing on these motions. After reviewing all matters submitted and researching the law relevant to the issues, the court is ready to rule.

## INDICTMENT

Gary Ray is the only defendant named in a five-count indictment charging drug offenses. Count 1 charges a conspiracy from October 31, 1998, through August 18, 2000, to manufacture in excess of 500 grams of methamphetamine. Count 2 charges attempt to manufacture methamphetamine on October 31, 1998. Count 3 charges possession of ephedrine and pseudoephedrine with intent to manufacture methamphetamine on October 31, 1998. Count 4 charges attempt to manufacture methamphetamine on August 18, 2000. Count 5 charges possession of ephedrine and pseudoephedrine with intent to manufacture methamphetamine on August 18, 2000.

## MOTION TO SUPPRESS EVIDENCE INVOLVING COUNTS TWO AND THREE

### Findings of Fact

On October 31, 1998, around 5:20 p.m., Sandra Omtvedt and her partner, both uniformed patrol officers with the Kansas City Police Department, responded to the dispatcher's call about a possible methamphetamine laboratory at unit 3 of the Crest Motel, 8600 State Ave., Kansas City, Kansas. Another uniformed Kansas City police officer patrolling in a different car, Leslie Phelps, also went to the Crest Motel in response to a dispatch call that neighbors had complained of drug activity at this location. The officers Omtvedt and Phelps went to unit 3 to conduct a "knock and talk." They knocked on the unit's door and waited a minute or more before a white female holding a small child opened the door and stood in the opening. The

officers learned that the female's name was Ms. Charlene Annen.

The officers immediately noticed coming from the room a strong chemical odor which by training and experience they associated with chemicals used in the manufacture of methamphetamine. The officers identified themselves and explained that they were there investigating complaints received about drug activity or a possible methamphetamine laboratory at this address. The officers asked her if any other persons were in the room. Ms. Annen answered that her boyfriend, Gary Ray, had been in the room but had just left by way of the room's window. Officer Phelps promptly asked Ms. Annen if they could look in the room to clear up the situation created by the neighbors' complaints and find the cause of the odor. Ms. Annen indicated the officers could enter the room and look.

Ms. Annen and her two-year-old child waited outside with officer Omtvedt while officer Phelps went inside the room. Officer Omtvedt stayed outside because the very strong odor coming from the room already was causing her eyes to water and her skin to burn. Officer Phelps went into the room and exited shortly after finding substances believed to be used in the manufacture of methamphetamine. Officer Phelps then called dispatch asking for vice and narcotics officers to come and process the scene. Officer Phelps testified that he experienced a burning sensation on his skin while he was in the room.

At this time, officer Omtvedt took Ms. Annen and her child to the Providence Medical Center to be checked for side effects from being in the room with chemicals. The physicians did not find anything physically wrong with the mother or the child. While at the hospital, officer Omtvedt completed a standard arrest form that indicated there was a child in need of care. Officer Omtvedt also explained to Ms. Annen that the form would be routinely forwarded to the Social and Rehabilitation Services ("SRS") and that the SRS would decide whether to conduct an investigation and what actions to take with regards to custody of the child. The child was then released to Ms. Annen's friend, and officer Omtvedt took Ms. Annen back to the motel and placed her in the custody of Detective Davenport.

The defendant's common-law wife, Charlene Annen, testified at the suppression hearing that officers knocked on the unit's door, identified themselves, explained they had received a complaint about a suspicious odor, and ordered her to open the door. She opened the door and saw four or five officers. When she refused their request to enter the unit, the officers threatened to take her child if she didn't let them inside. Afraid of losing her child, she opened the door wider and the officers came inside.

The court does not find Ms. Annen's testimony about the voluntariness of her consent to be credible. There is no evidence that four or five officers could have been present during the knock and talk. Ms. Annen further testified that there was no strong chemical odor in the room which is contradicted by not only Phelps' and Omtvedt's testimony but by the presence of chemicals found in the room, by the neighbors' complaints about a possible methamphetamine laboratory, and by the officers' decision to have Ms. Annen and her child taken immediately to the hospital. As displayed in her testimony and in her conduct involving the other incident, Ms. Annen is knowledgeable of her rights and possesses the fortitude to exercise them. Knowing that her husband had fled successfully through the unit's window and realizing that the officers had detected the strong chemical odor coming from the room, Ms. Annen obviously would have felt

less compulsion about stalling the officers' inevitable entry and search of the unit. The court rejects Ms. Annen's testimony about the involuntariness of her consent as inconsistent with circumstantial evidence, as lacking sufficient indicia of credibility, and as contradicted by the testimony of officers Phelps and Omtvedt, both of whom testified in a manner that was generally consistent with their reports, with each other, and with the circumstantial evidence.

### Arguments

The defendant argues the government is unable to carry its burden of proving that Ms. Annen voluntarily consented to the officers entering her room. The defendant insists the officers engaged in coercive and threatening conduct leading to Ms. Annen's acquiescence instead of her lawful and voluntary consent. The government responds that the evidence demonstrates that Mr. Annen's consent was freely and voluntarily given.

### Governing Law

 A warrantless search is *"per se unreasonable"* unless one of specifically established exceptions, like consent, is present. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (quotations omitted). Valid consent is that which is freely and voluntarily given. *United States v. Patten,* 183 F.3d 1190, 1194 (10th Cir.1999) (citation omitted). Voluntariness is a question of fact to be determined from the totality of all the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. at 227, 93 S.Ct. 2041. A court makes this determination without presuming the consent was voluntary or involuntary. *United States v. Hernandez,* 93 F.3d 1493, 1500 (10th Cir.1996).

For this exception to apply, the government must prove by a preponderance of the evidence that consent was freely and voluntarily given. *United States v. Soto,* 988 F.2d 1548, 1557 (10th Cir.1993). The

government does not discharge its burden "by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina,* 391 U.S. 543, 549, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). The government first "must present 'clear and positive testimony that consent was unequivocal and specific and freely and intelligently given.'" *United States v. Pena,* 143 F.3d 1363, 1367 (10th Cir.) (quoting *United States v. Angulo–Fernandez,* 53 F.3d 1177, 1180 (10th Cir.1995)), *cert. denied,* 525 U.S. 903, 119 S.Ct. 236, 142 L.Ed.2d 194 (1998). The government also must prove that the officers used no implied or express duress or coercion in obtaining the consent. *Id.* This determination is made upon considering the totality of the circumstances. *Schneckloth,* 412 U.S. at 225–27, 93 S.Ct. 2041.

 The determination entails weighing several relevant factors. An officer's failure to advise that a person may refuse to consent is relevant, but it is only one factor and is not dispositive. *United States v. Pena,* 143 F.3d at 1367; see *Schneckloth,* 412 U.S. at 249, 93 S.Ct. 2041 ("[W]hile the subjects knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent."). Other relevant factors include the number of officers present, " 'physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and physical and mental condition and capacity of the defendant within the totality of the circumstances.' " *United States v. Pena,* 143 F.3d at 1367 (quoting *United States v. McCurdy,* 40 F.3d 1111, 1119 (10th Cir.1994) (internal quotation omitted)); *United States v. Cabrera,* 117 F.Supp.2d 1152, 1157 (D.Kan. 2000). A court must remain mindful that these factors are not evaluated in a vacu-

um but rather in the totality of the circumstances.

### Analysis and Conclusion

■ The government has carried its burden of proving by a preponderance of the evidence that Ms. Annen freely and voluntarily consented to the search of unit 3 at the Crest Motel on October 31, 1998. The officers used a conversational tone in speaking with Ms. Annen, and their conversation lasted no longer than a minute or two. The officers never physically touched Ms. Annen prior to obtaining her consent. Ms. Annen appeared to understand what the officers were saying as shown by her appropriate responses. There is no credible evidence that the officers expressly or impliedly threatened, coerced, or used duress against Ms. Annen in obtaining her consent. The knock and talk occurred during the day outside a motel unit. Ms. Annen did not attempt to condition or withdraw her consent and did not later object to the search. We conclude from the totality of circumstances established by a preponderance of the evidence that Ms. Annen freely and voluntarily consented to the officers entering and searching unit 3.

## MOTION TO SUPPRESS EVIDENCE INVOLVING COUNTS ONE, FOUR AND FIVE

### Findings of Fact

Around 1:30 a.m. on August 18, 2000, patrol officers Mike Golden and Jeff Jacks with the Kansas City Police Department went to the residence located at 6301 State Ave., Lot 68 within a trailer park in Kansas City, Kansas. Earlier that evening, the officers had arrested an individual who told them that there was a methamphetamine laboratory at this residence. From a prior arrest of Gary Ray, Officer Jacks recognized the address as the residence of Gary Ray. The officers arrived at the location and walked to the porch where they overheard the voices of two males and one female coming from the trailer.

The officers knocked on the door, and a woman inside shouted her greeting without opening the door. The officers identified themselves and the woman came to an opened window near the south end of the trailer and began talking with the officers. When asked, the woman told officers her name was Ms. Charlene Annen and provided officers with documents confirming the same. The officers asked dispatch to run a computer check on Ms. Annen and on the residence. There were no active warrants for Ms. Annen, but dispatch reported that Gary Ray had given this address as his residence and that there were several active warrants on Mr. Ray that totaled over a thousand dollars.

The officers then asked Ms. Annen if Gary Ray was there, and Ms. Annen answered that he lived there but he wasn't home and that she did not know where he was. Officers told her they had received information about a possible methamphetamine laboratory in the trailer and asked if they could come inside and look around. Ms. Annen refused their request and continued to refuse the officers' requests when repeated. After talking with Ms. Annen for fifteen to twenty minutes, the officers went to the residence of Wilma Starr, the trailer park manager.

The officers explained the situation to Ms. Starr and asked for her help in gaining entrance to the trailer at Lot 68. Ms. Starr said that it was a rental trailer under her management and that she would help the officers. Ms. Starr testified it was common for her to assist officers when they were called to her trailer park. Ms. Starr went to Lot 68 and knocked on the door. Ms. Annen said she would allow Ms. Starr inside but not the officers. Ms. Starr told Ms. Annen to open the door and let them inside. Ms. Annen repeated her

refusal to the officers coming inside. Ms. Starr stated that if Ms. Annen didn't open the door then she was getting her truck and "coming in one way or another." Ms. Starr continued to speak with Ms. Annen about opening the door, and after five to ten minutes, Ms. Annen opened the door. Ms. Starr walked inside and the officers followed her inside the trailer.

Upon entering the trailer, the officers immediately smelled a strong chemical odor that caused their eyes and skin to burn. A gentleman appeared from the hallway who officers learned was Jeff Julian. While heading down the hallway, the officers heard a noise and then saw a man, who they believed to be Gary Ray, jumping out one of the windows. Both officers then pursued the man but were unable to apprehend him. When they returned to the trailer, the officers went back in and found no one there other than Ms. Starr. Eventually, a search warrant was obtained and executed on the trailer and the vehicle parked next to it.

The defendant presented the testimony of his wife, Ms. Annen, who said that she refused the officer's request to enter and Ms. Starr's request to enter with the officers. Ms. Annen also testified that she gave Ms. Starr permission to come in alone. At that point, Ms. Starr opened the door and the officers rushed in behind her. The court does not find Ms. Annen's testimony to be credible, as it is contradicted by the more credible testimony of Ms. Starr and by the circumstantial evidence in the case, and because she gave testimony that was not credible concerning her consent for the motel room search.

### Arguments

The defendant advances several contentions beginning with the officers' persistent efforts to gain entry into the house using "knock and talk" techniques during nighttime hours constituted an unlawful seizure of the occupants. The officers entered the trailer without a warrant and without obtaining valid consent from Ms. Annen. The officers lacked any exigent circumstances to justify entry without a warrant. After the officers failed to apprehend the defendant, the officers entered the trailer again without justification. It was during this unlawful re-entry that the officers observed the items identified as a methamphetamine laboratory and listed in the affidavit in support of the search warrant. As a result, the subsequent search warrant was obtained using the fruits of an illegal seizure and the unlawful entry and re-entry into the residence. The defendant contends the warrant is invalid as based on a partially false affidavit in that it says Ms. Annen gave the officers permission to enter and search for Mr. Ray. Finally, without the illegally obtained and misleading information, there was insufficient probable cause for the warrant to issue.

The government maintains the officers' entry into the defendant's residence is justified by both Ms. Annen's voluntary consent and by officers' efforts to execute an arrest warrant. With regards to the latter ground, the officers had heard two male voices coming from the trailer giving them a reasonable basis for believing that one of the voices belonged to the defendant Ray who they knew lived at this residence. The officers further knew from prior encounters with Mr. Ray that he would attempt to conceal himself and/or flee when given the chance. Under these circumstances, the officers lawfully entered the residence in an effort to execute the arrest warrant. Once they entered the premises, they smelled the chemicals and observed the items giving them the probable cause needed for the subsequent search warrant.

### Governing Law

The technique of "knock and talk" has been defined by courts "as 'a noncusto-

dial procedure [in which] the officer identifies himself and asks to talk to the home occupant and then eventually requests permission to search the residence.'" *United States v. Hardeman*, 36 F.Supp.2d 770, 777 (E.D.Mich.1999) (quoting *United States v. Miller*, 933 F.Supp. 501, 505 (M.D.N.C. 1996)); *see United States v. Cruz*, 838 F.Supp. 535, 542–43 (D.Utah 1993) (knock and talk is lawful and constitutional if it meets the standards for a valid consent search). Courts generally have upheld this investigative procedure as a legitimate effort "to obtain a suspect's consent to search." *Hardeman*, 36 F.Supp.2d at 777 (citations omitted). "[C]ourts may consider the use of the 'knock and talk' procedure as one of the circumstances in evaluating whether consent was given and, if so, whether consent was given voluntarily." *Id.* (citing *Miller*, 933 F.Supp. at 505 and *United States v. Tobin*, 923 F.2d 1506, 1509 (11th Cir.), *cert. denied*, 502 U.S. 907, 112 S.Ct. 299, 116 L.Ed.2d 243 (1991)).

A knock and talk is ordinarily consensual unless coercive circumstances such as unreasonable persistence by the officers turns the encounter into an investigatory stop. *United States v. Jerez*, 108 F.3d 684, 691–92 (7th Cir.1997). The court recognizes that other factors, such as a display of weapons, physical intimidation or threats by the police, multiple police officers questioning the individual, or an unusual place or time for questioning may transform a consensual encounter between a citizen and a police officer into a seizure. *See United States v. Maragh*, 894 F.2d 415, 418 (D.C.Cir.), *cert. denied*, 498 U.S. 880, 111 S.Ct. 214, 112 L.Ed.2d 174 (1990); *United States v. Baskin*, 886 F.2d 383, 386–87 (D.C.Cir.1989), *cert. denied*, 494 U.S. 1089, 110 S.Ct. 1831, 108 L.Ed.2d 960 (1990).

Consistently, the Supreme Court has emphasized "the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic," because unlike other locations the home "provide [s] the setting for those most intimate activities that the Amendment is intended to shelter from government interference or surveillance." *Oliver v. United States*, 466 U.S. 170, 178–79, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) (citations omitted). "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh v. Wisconsin*, 466 U.S. 740, 748, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) (quoting *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)). Indeed, "the common law maxim 'every man's house is his castle' is part of our Fourth Amendment jurisprudence prohibiting unreasonable searches and seizures." *United States v. Gay*, 240 F.3d 1222, 1226 (10th Cir.2001) (quoting *Payton v. New York*, 445 U.S. 573, 590, 597 n. 45, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) ("the Fourth Amendment draws a 'firm line at the entrance to the house [and][a]bsent exigent circumstances that threshold may not reasonably be crossed without a warrant' ")), *cert. denied*, 533 U.S. 939, 121 S.Ct. 2571, 150 L.Ed.2d 735 (2001).

"Although searches and seizures inside a home without a search warrant are presumptively unreasonable, 'an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.'" *United States v. Gay*, 240 F.3d at 1226 (quoting *Payton*, 445 U.S. at 603, 100 S.Ct. 1371). " 'Because an arrest warrant authorizes the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home.' "

*Valdez v. McPheters,* 172 F.3d 1220, 1224 (10th Cir.1999) (quoting *Steagald v. United States,* 451 U.S. 204, 214 n. 7, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981)). Based on *Payton,* this circuit employs a "two-prong test: officers must have a reasonable belief the arrestee (1) lived in the residence, and (2) is within the residence at the time of the entry." *Gay,* 240 F.3d at 1226; *see also Valdez,* 172 F.3d at 1224.

"While probable cause itself is a relatively low threshold of proof, it is a higher standard than 'reasonable belief', which is, as everyone agrees, the appropriate standard." *Valdez v. McPheters,* 172 F.3d at 1227 n. 5 (citation omitted). "[T]he officers' assessment need not in fact be correct; rather, they need only 'reasonably believe' that the suspect resides at the dwelling to be searched and is currently present at the dwelling." *United States v. Risse,* 83 F.3d 212, 216 (8th Cir.1996) (citations omitted); *see Valdez,* 172 F.3d at 1225. " 'The facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry.' " *Valdez,* 172 F.3d at 1224 (quoting *United States v. Magluta,* 44 F.3d 1530, 1535 (11th Cir.), *cert. denied,* 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995)).

### Analysis and Conclusion

The court looks first at whether the officers' initial entry fits the exception for execution of arrest warrants. The defendant does not dispute the validity of the outstanding arrest warrants nor challenges the probable cause supporting them. The government introduced evidence that as of August 18, 2000, the defendant had seven outstanding warrants for his arrest, including a warrant for a probation violation. The defendant takes the position that most, if not all, of these outstanding war-

rants are for misdemeanors and that such warrants do not authorize officers to enter a dwelling in their execution. The defendant argues for a narrow reading of *Payton* which would restrict the rule to felony warrants or to misdemeanor warrants only when accompanied by exigent circumstances.

The defendant's argument is not new to this court. In *United States v. Meindl,* 83 F.Supp.2d 1207, 1215 (D.Kan.1999), this court discussed this issue at length before concluding that: "[t]he weight of authority persuades the court that *Payton* is not limited to the execution of felony arrest warrants and that officers serving a misdemeanor arrest warrant have the limited authority to enter a suspect's residence when the officer reasonably believes the suspect is present." In *Meindl,* the court noted that the Tenth Circuit in *Howard v. Dickerson,* 34 F.3d 978, 981 (10th Cir. 1994), had recognized "that federal law would permit an arrest at home on a misdemeanor arrest warrant." 83 F.Supp.2d at 1214. More recently, the Eight Circuit has joined the other courts following this rule:

> We agree with those courts that have held that this principle applies with equal force to misdemeanor warrants. *See United States v. Spencer,* 684 F.2d 220, 222–24 (2d Cir.1982); *United States v. Meindl,* 83 F.Supp.2d 1207, 1215 (D.Kan.1999); *cf. Kain v. Nesbitt,* 156 F.3d 669, 672 (6th Cir.1998) (assuming but not holding that principle applies to misdemeanor warrants); *United States v. Albrektsen,* 151 F.3d 951, 953 (9th Cir.1998) (same); *Lyles v. City of Barling,* 17 F.Supp.2d 848, 855 n. 6 (W.D.Ark.1998) (same), *aff'd,* 181 F.3d 914 (8th Cir.1999) (same).

*United States v. Clayton,* 210 F.3d 841, 844 (8th Cir.2000). The court remains convinced that its holding in *Meindl* is

proper and that the rule from *Payton* covers misdemeanor arrest warrants. Thus, upon learning of the outstanding warrants, which included the warrant for a probation violation, the officers here were justified in entering the residence if they reasonably believed that Ray lived at the residence and that he was present there at the time.

■ The undisputed evidence establishes that the officers reasonably believed Gary Ray lived at the residence. Mr. Ray had been arrested previously at this residence, the police department's computer listed the defendant as a resident for this location, and Ms. Annen also told officers that Mr. Ray lived there. The officers also had reason to believe the defendant was present. It is reasonable to believe a resident would be home at the time of day when the officers made their entry. The officers also heard the voices of two males and one female coming from inside the residence. The officers could take into account that the defendant Ray would want to conceal himself in light of the officers' inquiry about a possible methamphetamine laboratory at this residence. Even though Ms. Annen spoke with officers and denied that Gary Ray was present, the officers reasonably believed that the defendant was hiding inside and that Ms. Annen was assisting Mr. Ray in concealing his whereabouts. Having found that the officers here reasonably believed the defendant was present, the court concludes the officers justifiably entered the residence to execute the outstanding warrants.

■ The defendant also contends the particular "knock and talk" techniques used during nighttime hours constituted an unlawful seizure of the occupants. Admittedly, it occurred during the early morning hours, but the officers determined that several persons were inside and awake before knocking. There is no evidence that the lateness of the hour impaired in any way the Ms. Annen's ability to engage in a consensual encounter. The court has no basis for believing that the Ms. Annen and the defendant were abruptly awakened from their sleep by the knock on their door. As for the length and nature of the encounter, there is nothing significant that occurred here prior to the officers learning of the defendant's outstanding warrants. The circumstances were not so coercive as to change the nature of the initial encounter from a consensual one to either an investigatory seizure or a custodial interrogation. Because the officers were lawfully justified to enter the premises upon learning of the warrants, the court need not judge the propriety of the knock and talk procedures used after that point. *see United States v. Clayton,* 210 F.3d at 845 ("consent is not required to execute a valid arrest warrant").

■ The defendant next takes issue with the officers' re-entry into the trailer upon returning from their unsuccessful pursuit of him. Neither in its brief nor at the hearing did the government focus any particular arguments to this issue, other than generally relying on a consensual search. The court finds that the government has not carried its burden of proving that Ms. Annen voluntarily consented to the officers' entry and search of her home. Nonetheless, the court is satisfied that the officers were lawfully entitled to re-enter the trailer for other reasons. Though a person appearing to be Gary Ray had ostensibly eluded them, the officers reasonably needed to confirm by way of a protective sweep that Mr. Ray was not still hiding in the residence. In addition, the officers were entitled to make a protective sweep in order to secure the residence and prevent the destruction of evidence which they had smelled upon their initial entry and to ensure the safety of the officers and the residence. *See United States v. Scro-*

**1114**

*ger,* 98 F.3d 1256, 1259–60 (10th Cir.1996) (" 'When officers have reason to believe that criminal evidence may be destroyed or removed before a warrant can be obtained, the circumstances are considered sufficiently critical to permit a warrantless entry.' ") (quoting *United States. v. Parra,* 2 F.3d 1058, 1064 (10th Cir.), *cert. denied,* 510 U.S. 1026, 114 S.Ct. 639, 126 L.Ed.2d 597 (1993)), *cert. denied,* 520 U.S. 1149, 117 S.Ct. 1324, 137 L.Ed.2d 485 (1997). For both of these reasons, the officers were legally justified in re-entering the trailer and conducting a cursory search to determine if Gary Ray or anyone else was hiding in the trailer.

■ Finally, the defendant insists the affidavit in support of the search warrant is false in stating that Ms. Annen consented to the search. The defendant contends that "[h]ad the magistrate known the circumstances by which the police learned of the contents of the trailer, the court would not have issue the warrant." (Dk. 30, p. 12). Whether or not the affidavit is false about Ms. Annen's consent, the facts averred in the search warrant were based on observations made during the officers' lawful presence in the trailer. For all of the reasons expressed above, the court denies the defendant's motion to suppress.

IT IS THEREFORE ORDERED that the defendant's Motion to Suppress Evidence Involving Counts Two and Three (Dk. 27) and Motion to Suppress Evidence Involving Counts One, Four and Five (Dk. 29) are denied.